[Cite as *State v. Crook*, 2024-Ohio-80.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

State of Ohio,                                   :          Case No.   23CA7

    Plaintiff-Appellee,                      :

                                            :          <u>DECISION AND</u>
v.                                                     :          <u>JUDGMENT ENTRY</u>

Rena L. Crook,                                 :

    Defendant-Appellant.                  :          **RELEASED 1/8/2024**

_____

APPEARANCES:

Zachary Tabler, Columbus, Ohio, for appellant.

Jonathan E. Robe, Robe Law Office, Athens, Ohio, for appellee.

_____

Hess, J.

{¶1}   Rena L. Crook appeals from a judgment of the Athens County Municipal Court convicting her of depriving an animal of sustenance in violation of R.C. 959.131(D)(2).   In her sole assignment of error, Crook asserts that her conviction was against the manifest weight of the evidence.   For the reasons which follow, we overrule the assignment of error and affirm the trial court's judgment.

## I.  FACTS AND PROCEDURAL HISTORY

{¶2}   In March 2023, Crook was charged via complaint with violating R.C. 959.131(D)(2), a second-degree misdemeanor. She pleaded not guilty, and on April 18, 2023, the matter proceeded to a bench trial. Kristopher Young, deputy dog warden for the Athens County Dog Shelter, testified that on February 23, 2023, he got a complaint from Athens County EMS, which reported that Crook had been transported to the hospital, that

she had taken a dog with her as a service animal, and that the dog was malnourished. Later that day, he went to Crook's home. She was outside and screamed at Warden Young to not take her dog. Her husband, Scott Dexter, calmed her down. Warden Young asked Crook to get the dog, a Great Dane named Prince. As soon as Crook opened the door to bring Prince outside, Warden Young could see from about 30 feet away that Prince was "severely skinny." As Prince got closer, Warden Young "could see all of his ribs" and his spine. Prince also had sores on his hips, and his nails were "maybe a little over an inch long." When asked if Prince walked "gingerly," Warden Young testified, "He had a little bit of stumble to him. I could tell he was a little weak."

{¶3} Crook and Dexter told Warden Young they had been feeding Prince. However, Prince appeared malnourished to Warden Young, and he impounded Prince. Prince was not able to jump up into Warden Young's vehicle, and Crook and Dexter had to help Warden Young "get him loaded up." Warden Young took Prince to the dog shelter, where he was photographed. Four photographs of Prince from that day were admitted into evidence. Warden Young then took Prince to veterinarian Dr. Marshall Aanestad for "a well check." Warden Young saw Prince two more times after that, most recently about a month before trial. Prince had gained roughly 15 pounds and "was actually able to jump up into the back of a vehicle on his own." Warden Young testified that he had no reason to believe Prince was suffering from parasites or anything that could be eating his fat, but Warden Young also testified that he did "not have vet training to even consider that." Warden Young also gave testimony about other animals in the home.

{¶4} Dr. Aanestad testified that on February 23, 2023, he examined Prince, who was three years old. Dr. Aanestad testified that Prince appeared malnourished. One

"could clearly see the dog's ribs, as well as its spine." On a body condition scale of one to nine, with one being extremely emaciated and nine being extremely obese, Prince was a two-and-a-half. Prince was 89 pounds, and Dr. Aanestad testified that he wrote in his report that the dog should probably weigh 20 or 30 pounds more. On cross-examination, Dr. Aanestad admitted that in a letter he said that a healthier weight for Prince would be 100 to 120 pounds, i.e., 11 to 31 pounds more. Dr. Aanestad testified that the most common reason an animal appears malnourished is underfeeding but that there is "always a possibility of other underlying diseases." Dr. Aanestad testified that if a dog appears malnourished but is otherwise healthy, he does not run bloodwork to rule out those other diseases. He did not "do full diagnostics" on Prince. When asked, "And did you have any recommendations as far as the dog being underweight [inaudible] feed it?" Dr. Aanestad testified, "certainly [inaudible] bloodwork would be warranted just to make sure that there was not something else going on. We did run a heartworm test at the time just to rule out any possibility of heartworms or [inaudible] tapeworm diseases. That's kind of just the standard diagnostic when [inaudible] the dog shelter."

{¶5} Dr. Aanestad testified that Prince also had "a lot of debris in both ears" and had "a pretty severe infection in both ears." In addition, Prince had "very long toenails" which were "curling around." Prince's ears were cleaned, he was given ear medications, and his nails were cut. Dr. Aanestad testified that feeding or not feeding Prince would "[n]ot necessarily" affect his nails and would not affect his ear infections. When asked if he could conclude whether Prince was being cared for properly, Dr. Aanestad testified: "Based on my findings, I would think that somebody was not taking care of this dog. Simply because someone would have noticed that it did have an ear infection. You know,

most anybody could tell that it was very skinny, and you know, probably should have additional care."

{¶6}    Dexter testified that on October 4, 2022, Crook acquired Prince.  At the time, Prince looked the "[s]ame as the day that [Warden Young] came and picked him up, skinny."  Prince would not eat, so Dexter and Crook contacted the dog shelter.  They explained that they were trying to rescue Prince, and Dexter asked for advice on getting him to eat.  Dexter also sought advice from a veterinarian's office. Dexter and Crook "tried to feed" Prince and "nurse him back to health."  Dexter got a pound of bologna for Prince.  Dexter then tried mixing tuna in Prince's food, and Prince ate it.  After that, Prince ate "regular dog food" and "started gaining weight." Crook was typically responsible for feeding Prince and did so maybe three to five times a day. Dexter and his daughter, Tamara Ritchie, also fed the dog. Dexter testified that normally he and Crook bought Prince's food and that they bought five to seven bags a month. Dexter testified that Defense Exhibit 1 was a photograph he took in January 2023 of five bags of dog food which collectively weighed 264 pounds.  He testified that every month he bought Prince an amount of food similar to that shown in the photograph.  When asked if Prince ever had trouble walking, Dexter testified that Prince "looked like he was kind of sore in the back," like he had "arthritis or something like that." Dexter testified that he had to help Prince into Warden Young's truck because he "was scared and petrified."

{¶7}    Ritchie testified that she lived with Prince beginning in December 2022 and gave him food and water daily.  However, Crook was mostly responsible for feeding him and did so three times a day. Ritchie testified that Prince's food was stored in "big old totes," that Defense Exhibit 2 was a photograph of "two big totes of dog food," and that

the totes were in the home before she moved into it. During cross-examination, Ritchie admitted the dog food in Defense Exhibit 1 and totes in Defense Exhibit 2 were purchased the day Prince was impounded. However, she claimed the photographs depicted the amount of dog food usually in the home. And she testified that there were "[a]lways totes in the house," but they "were old," and the new ones were purchased because "the dog warden was like, hey, you need to have a big, you know, totes for the—for Prince [sic]. And we did that."

{¶8}   The trial court found Crook guilty, stating:

[W]hat I need to rule on at this point in time is the 959.131 D2 charge. While there were indications of other concerns, those are not part of the issue before the court. The other animals that were in the home and were in different levels of health are also not part of today's hearing. And what I'll have to rule on is whether or not there was necessary sustenance. * * * [T]he remaining issue is whether or not the animal was receiving necessary sustenance so that it would not suffer in any way as a result of the deprivation of that necessary sustenance. I would've liked to have known whether or not there was a parasite or something else that could have led to the malnourishment of Prince. The photographs are very compelling. Prince was significantly underweight, and that's obvious from these photographs. The testimony of Dr. Aanestad confirms that, and that raises the issue of the concern about the nourishment and the sufficiency of that necessary sustenance. If I had not had the testimony that Prince had put on 15 pounds without treatment for parasites or for other potential reasons for the non-nourishment, then I would not have found that there was proof beyond a reasonable doubt in this case. But I do have that testimony. He has put on 15 pounds in a relatively short period of time since being taken into the custody of the dog shelter. And that I find compelling. I will find that Prince was not provided with the necessary sustenance and that includes having enough of it, not just that there was food. I'll accept that there was testimony that he was being fed, but he wasn't being fed enough and he needed more. So I'll make the finding of guilty on the charge * * *.

The court imposed a 30-day jail term and $200 fine, which it suspended on conditions of probation. The court also ordered that Prince be forfeited to the dog shelter.

## II. ASSIGNMENT OF ERROR

{¶9}   Crook presents one assignment of error: "Appellant's conviction of Deprive

Animal of Sustenance was in error due to the manifest weight of the evidence."

## III. LAW AND ANALYSIS

{¶10} In the sole assignment of error, Crook asserts that her conviction was

against the manifest weight of the evidence.   In determining whether a conviction is

against the manifest weight of the evidence, an appellate court

> must review the entire record, weigh the evidence and all reasonable
> inferences, consider the credibility of witnesses, and determine whether, in
> resolving conflicts in the evidence, the trier of fact clearly lost its way and
> created such a manifest miscarriage of justice that reversal of the conviction
> is necessary.   In order to satisfy this test, the state must introduce
> substantial evidence on all the elements of an offense, so that the jury can
> find guilt beyond a reasonable doubt.
>
> Although a court of appeals may determine that a judgment of a trial court
> is sustained by sufficient evidence, that court may nevertheless conclude
> that the judgment is against the weight of the evidence.   However, we are
> reminded that generally, it is the role of the jury to determine the weight and
> credibility of evidence.   " 'A jury, sitting as the trier of fact, is free to believe
> all, part or none of the testimony of any witness who appears before it.' "
> *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338,
> ¶ 17, quoting *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-
> 1941, ¶ 23.   We defer to the trier of fact on these evidentiary weight and
> credibility issues because it is in the best position to gauge the witnesses'
> demeanor, gestures, and voice inflections, and to use these observations
> to weigh their credibility.

(Citations omitted.)  *State v. Anderson*, 4th Dist. Highland No. 18CA14, 2019-Ohio-395,

¶ 14-15.

{¶11}  R.C. 959.131(D)(2) states

No person who confines or who is the custodian or caretaker of a
companion animal shall negligently do any of the following:

* * *

(2) Deprive the companion animal of necessary sustenance or confine the companion animal without supplying it during the confinement with sufficient quantities of good, wholesome food and water if it can reasonably be expected that the companion animal would become sick or suffer in any other way as a result of or due to the deprivation or confinement[.]

{¶12} Crook maintains that the state did not prove beyond a reasonable doubt that she deprived Prince of necessary sustenance. Crook asserts that "Dr. Aanestad testified that he did not think someone was taking care of the dog, simply because such a person would have noticed that Prince had an ear infection, although Dr. Aanestad then stated that feeding or not feeding the dog would not have any effect on an ear infection." Crook also asserts that even though there are many potential causes of an animal being underweight, such as disease, and Dr. Aanestad testified that bloodwork would be warranted to ensure there was " 'not something else going on,' " "neither bloodwork nor a full diagnostics was ever completed to make such a determination." Instead, Dr. Aanestad "just concluded that Prince was 'malnourished' without further investigation." And "[w]ithout bloodwork or other diagnostic testing to rule out underlying disease, the Court simply concluded that Prince was not provided with necessary sustenance."

{¶13} Crook asserts that the trial court "seemingly fail[ed] to consider that perhaps Prince was a selective eater." Crook maintains that "[t]his would explain why Prince refused to eat when" she "first adopted him but 'tore up' a bowl of food mixed with [t]una and ate a pound of bologna." Crook asserts that "[t]his would further explain why Prince was underweight when" she got him and "appeared to be the same weight throughout [her] ownership as she fed him only regular dog food and then [he] immediately gained weight when taken out of [her] care." [*Id.*] She asserts that "[p]erhaps * * * he was provided with a different brand of dog food that was much preferred." Crook claims "[t]his

explanation is further in line with testimony that multiple individuals, including [her], provided Prince with dog food on a daily basis, yet [he] still looked the same while in [her] care."

{¶14} After weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the trial court's determinations, we conclude that in resolving evidentiary conflicts, the trial court did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse Crook's conviction. Crook's suggestion that Prince was skinny at the time of impoundment because he was a selective eater is not supported by the evidence presented at trial. Although Dexter testified that Prince initially would not eat in October 2022, Dexter also testified that after he mixed tuna into Prince's food, Prince ate regular dog food. Dexter and Ritchie testified that Prince was fed multiple times a day. Their testimony suggests that Prince was skinny at the time of impoundment in February 2023 despite eating multiple times a day, not that he was skinny at that time because he was a selective eater and was not consuming the food provided.

{¶15} The trial court concluded that Prince was being fed but that he was not being fed enough, and evidence supports that conclusion. The state presented testimony and photographic evidence showing that on February 23, 2023, Prince was extremely skinny. Warden Young and Dr. Aanestad testified that Prince's ribs and spine were visible. Dr. Aanestad rated Prince a two-and-a-half on a body condition scale of one to nine, with one being extremely emaciated and nine being extremely obese. Although Dr. Aanestad did not test Prince for medical issues aside from heartworms and tapeworms, Warden Young testified that he saw Prince about a month before trial, i.e., around March 18, 2023, and

the dog had gained about 15 pounds.  The fact that within roughly 23 days of removal from Crook's care, Prince gained about 15 pounds without any weight-related medical treatment is circumstantial evidence that the reason Prince had been underweight was that Crook negligently deprived him of necessary sustenance.  "[C]ircumstantial evidence carries the same weight as direct evidence."  *State v. Arthur*, 4th Dist. Scioto No. 01CA2818, 2002-Ohio-3764, ¶ 19.

{¶16} For the foregoing reasons, we conclude that Crook's conviction was not against the manifest weight of the evidence.  We overrule the sole assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Municipal Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
        Michael D. Hess, Judge



### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**